1            IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF COLORADO

3    Criminal Action No. 16-cr-0054-WJM-3

4    UNITED STATES OF AMERICA,

5    Plaintiff,

6    vs.

7    MERCEDES DIAZ,

8    Defendant.

9    ------------------------------------------------------------

10                   REPORTER'S TRANSCRIPT
                          (Sentencing)

11   ------------------------------------------------------------

12

13        Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

14   Judge, United States District Court for the District of

15   Colorado, commencing at 10:33 a.m., on the 12th day of

16   January, 2018, in Courtroom A801, United States Courthouse,

17   Denver, Colorado.

18                          APPEARANCES

19
         MARTHA A. PALUCH and BRYAN D. FIELDS, Assistant U.S.
20   Attorneys, 1801 California Street, Suite 1600, Denver,
     Colorado 80202, appearing for the plaintiff.

21
         SIDDHARTHA H. RATHOD, Rathod Mohamedbhai, LLC, 2701
22   Lawrence Street, Suite 100, Denver, Colorado 80205,
     appearing for the defendant.

23
                     MARY J. GEORGE, FCRR, CRR, RMR
24            901 19th Street, Denver, Colorado 80294
            Proceedings Reported by Mechanical Stenography
25              Transcription Produced via Computer

P R O C E E D I N G S

1     (Call to order of the court at 10:33 a.m.)

2          THE COURT:  We're on the record in criminal case

3     No. 16 cr 054, defendant No. 3, United States of America

4     versus Mercedes Diaz.  I'll take appearances of counsel.

5          MS. PALUCH:  Good afternoon, Your Honor, Martha

6     Paluch appearing on behalf of the United States.  With me

7     at counsel table is Special Agent Sandra Ennis.

8          SPECIAL AGENT ENNIS:  Good morning, Your Honor.

9          THE COURT:  Good morning to the two of you.  For

10    the defendant.

11         MR. RATHOD:  Good morning, Your Honor, Siddhartha

12    Rathod, appearing on behalf of Ms. Diaz, who's here to my

13    left.  Also appearing at counsel table today is Nicholas

14    Lutz, another attorney in our office who's not entered on

15    the case, who's just assisting me.

16         THE COURT:  That's fine.  All right.  Welcome to

17    the three of you.

18         Will the probation officer please identify herself

19    for the record.

20         PROBATION OFFICER:  Good morning, Your Honor.

21    Kyla Hamilton with probation.

22         THE COURT:  Good morning, Ms. Hamilton.  Welcome.

23         All right.  Mr. Rathod, will you and your client

24    please approach the lectern.

3

1      Ms. Hansen, will you please administer the oath to

2   the defendant.

3      COURTROOM DEPUTY:  Please raise your right hand.

4      (Defendant sworn in)

5      THE COURT:  All right.  The record reflects that

6   way back on the 7th of October of 2016, Ms. Diaz entered a

7   plea of guilty to and she was convicted of Count 1 of the

8   indictment, charging a conspiracy to defraud the Government

9   with respect to claims in violation of 18 United States

10  Code Section 286.  In addition, at her change of plea

11  hearing, the defendant also admitted the forfeiture

12  allegation in the indictment.

13     We are here for the sentencing of the defendant.

14  Since we have three motions respecting the length of the

15  sentence that I'll take considerable argument on, for now,

16  I just need counsel to very briefly summarize their

17  respective sentencing recommendations.

18     MR. RATHOD:  Your Honor, briefly.  The AUSA and I

19  both agreed, and I think there's a motion filed much more

20  significantly.  At the time of the plea agreement, Ms. Diaz

21  was an addict.  She had a positive UA within a period of

22  time -- in time to within 24 hours or 48 hours of her plea

23  agreement.

24     The Government has asked that Ms. Diaz reaffirm

25  her guilty plea and we are in agreement with that as well.

1          THE COURT:  So you want to re-arraign the

2    defendant again?

3          MS. PALUCH:  Your Honor, I point you to ECF 86,

4    and that was the Court's order that at the time of

5    sentencing we would reaffirm her guilty plea in light of

6    that positive UA the morning -- the morning of the change

7    of plea hearing.

8          THE COURT:  Wow, that was a while -- when was

9    that?  What number?  86?  Oh, we're in the 200s so that was

10   a while ago.

11         MS. PALUCH:  That's exactly right.  This was

12   entered on November 14th, 2016.  It's ECF 86 where you

13   stated the Court will inquire whether the defendant's use

14   of cocaine on the evening before her change of plea hearing

15   held on October 7th, 2016, in any way affected her ability

16   to fully understand that she was knowingly and voluntarily

17   entering an informed guilty plea to Count 1 of the

18   indictment.

19         MR. RATHOD:  I don't believe we need to do a whole

20   new arraignment; I think we can just reaffirm that point.

21         THE COURT:  Okay.  So how do you propose we go

22   about that, Ms. Paluch?

23         MS. PALUCH:  Well, I suppose we could just make a

24   record and make sure that Ms. Diaz is aware of the nature

25   of the offense she pled to, the elements, and the penalties

5

1      for that offense, and that she's willing to go forward with

2      that.

3              THE COURT:  All right.  It would have been nice if

4      you guys had reminded me of something that happened 16

5      months ago.

6              MS. PALUCH:  Your Honor, I did put that in -- I

7      put -- probably should have put it in a text, but I did put

8      it in a footnote in one of the sentencing pleadings.

9              THE COURT:  All right.  One second.

10             MS. PALUCH:  I can point you to that, if you'd

11     like.  That's found at ECF 261.

12             THE COURT:  All right.  Ms. Diaz, in light of all

13     that, let me ask you the following:

14             Do you recall your guilty plea on -- I just said

15     it -- October 7th, 2016?

16             THE DEFENDANT:  Yes, sir.

17             THE COURT:  Okay.  At that time, on the record you

18     were re-arraigned by the Assistant United States Attorney

19     on Count 1 of the indictment, 18 United States Code Section

20     286, conspiracy to defraud the Government with respect to

21     claims.  And you pled guilty at that time and you pled

22     guilty to the count and you were advised at the time that

23     the elements of that count were that the defendant, meaning

24     you, agreed with at least one other person to obtain or aid

25     in obtaining the payment or allowance of any false,

1    fictitious or fraudulent claim;

2            Second, that the defendant knew the essential

3    objective of the conspiracy;

4            Third, the defendant knowingly and voluntarily

5    participated;

6            And, fourth, there was an interdependence among

7    the members of the conspiracy, that is, members in some way

8    or manner intended to act together for their shared mutual

9    benefit within the scope of that conspiracy charged.

10           Do you still understand that those are the

11   elements of the count that you pled guilty to?

12           THE DEFENDANT:  Yes, sir.

13           THE COURT:  All right.  And you were advised at

14   the time that the maximum statutory sentence for conviction

15   of that crime was 10 years of imprisonment, a fine of not

16   more than $250,000, or both; not more than three years of

17   supervised release; and a $100 special assessment.  Do you

18   recall being advised of that?

19           THE DEFENDANT:  Yes, sir.

20           THE COURT:  All right.  And in -- you were also

21   advised that there were collateral consequences to your

22   guilty plea, including the loss of certain civil rights,

23   including that you were -- would lose the right to possess

24   a firearm, the right to vote, the right to hold public

25   office, and the right to sit on a jury.  Do you recall

1     that?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  Okay.  And you were advised that your

4     plea agreement included an appellate and collateral

5     challenge waiver, and that the -- there were exceptions to

6     your direct appeal waiver, and those were that if I imposed

7     upon you a sentence that exceeded the maximum penalty

8     provided in the statute, meaning the 10 years, or the

9     sentence that I impose exceeded an advisory guideline range

10    that applied to a total offense level of 17, or if the

11    Government, itself, appealed the sentence, that any one or

12    a combination of the three of those circumstances, you

13    would still retain your right to file a direct appeal, but

14    otherwise, you waived your right to file any appeal of your

15    conviction or your sentence.  Do you understand that?

16             THE DEFENDANT:  Yes, sir.

17             THE COURT:  All right.  And that generally

18    speaking, defendants also have a statutory right under 28

19    U.S.C. Section 2255 to collaterally attack through a habeas

20    petition proceeding, this sentence -- the conviction or the

21    sentence that I impose, and that you agree to waive your

22    rights under 2255 with only three exceptions:

23             That you could seek a collateral review of your

24    sentence so that you could receive the benefit of an

25    explicitly retroactive change in the sentencing guidelines

1    or sentencing statute; the defendant was deprived of the

2    effective assistance of counsel; and that the defendant,

3    meaning you, were prejudiced by prosecutorial misconduct.

4            Those are the only three exceptions to your waiver

5    of your rights to collaterally attack the conviction.  Do

6    you understand that?

7            THE DEFENDANT:  Yes, sir.

8            THE COURT:  Okay.  So based on all that, I'm going

9    to ask you to reaffirm the arraignment from October 2016.

10   Do you still -- is it still your intent and do you wish to

11   plead guilty to Count 1 of the indictment?

12           THE DEFENDANT:  Yes, sir.

13           THE COURT:  All right.  Is the Government

14   satisfied with the colloquy I've just had with the

15   defendant?

16           MS. PALUCH:  Yes, Your Honor.

17           THE COURT:  Great.  Mr. Rathod, are you --

18           MR. RATHOD:  Yes, Your Honor.

19           THE COURT:  All right.  So now let's proceed.

20           Again, very briefly summarize your respective

21   sentencing recommendations.  Ms. Paluch.

22           MS. PALUCH:  Yes, Your Honor, the Government in

23   this case is seeking a sentence of 33 months in prison,

24   followed by a three-year period of supervised release, with

25   all of the special conditions as requested by the probation

1    officer; an order of restitution in the amount of

2    $562,487.85, which amount will be -- should be ordered

3    jointly and severally with her three codefendants, and a

4    $100 special assessment.

5              THE COURT:  Thank you.  Mr. Rathod.

6              MR. RATHOD:  And then without argument at this

7    point, Your Honor --

8              THE COURT:  Right.

9              MR. RATHOD:  -- we are requesting probation at

10   this time.  I can go into further reasons why.

11             THE COURT:  Okay.  Ms. Paluch, does the Government

12   intend to offer any evidence or make any proffer at this

13   hearing?

14             MS. PALUCH:  We will not be presenting evidence,

15   Your Honor.

16             THE COURT:  Okay.  And are there any victims that

17   would later in the hearing wish to make a statement to the

18   Court?

19             MS. PALUCH:  No, Your Honor.

20             THE COURT:  All right.  Mr. Rathod, is the

21   defendant intending to issue any evidence or make any

22   proffer?

23             MR. RATHOD:  No.  Ms. Diaz would like to make a

24   statement to the Court as well as, while we had provided

25   the Court a number of letters, there's two brief statements

10

1     from Ms. Diaz's partner, Mr. Keith Inglish, and Ms. Diaz's

2     sister, Alexandria Diaz, if the Court would entertain

3     those.

4          THE COURT:  Okay.  I have reviewed those

5     communications.  And every defendant gets an opportunity to

6     make an allocution to me before they're sentenced, so we

7     will do that later in the hearing.

8          All right.  So turning to objections to the

9     report, I'm happy to state that there were no objections to

10    the report filed either by the Government or the defendant,

11    so that simplifies things at least on that front.

12         Turning to the Government's motions, at least the

13    two initial motions, the motion by the Government for a

14    three-level -- for a third-level decrease in the offense

15    level for acceptance of responsibility, ECF 258, there

16    being no objection, that motion is granted.

17         Turning to the Government's motion to dismiss

18    counts 20 and 21 of the indictment, ECF 257, again, there

19    being no objection, that motion is granted.

20         Counts 20 and 21 of the original indictment are

21    dismissed with prejudice as against defendant No. 3, Diaz,

22    only.

23         Given my ruling on the Government's motion, I find

24    that the total offense level in this case is 23.  The

25    probation officer has determined the defendant's Criminal

1   History Category to be 6, which yields an advisory

2   guideline sentencing range of 92 to 115 months, a period of

3   supervised release of one to three years, a fine range of

4   10,000 to $100,000, and a special assessment of $100.

5        Does counsel agree the Court has correctly

6   calculated the guideline sentencing range in this case

7   before the application of any departure or variance?

8        MS. PALUCH:  Correct, Your Honor.

9        THE COURT:  Okay.

10        MR. RATHOD:  Yes, Your Honor.

11        THE COURT:  All right.  Thank you, counsel.

12        All right.  The -- I'll next take up the

13   Government's motion for a downward departure for

14   substantial assistance, ECF 261.  Ms. Paluch, anything you

15   wish to add to your written submission?

16        MS. PALUCH:  No, Your Honor.

17        THE COURT:  All right.  Mr. Rathod, do you wish to

18   be heard on this?

19        MR. RATHOD:  Not on the Government's --

20        THE COURT:  Okay.  For the reasons set forth in

21   the motion, I grant the Government's motion for a downward

22   departure.  I expressly find that the statutory purposes of

23   sentencing are best served by the imposition of a reduced

24   custodial sentence pursuant to Section 5K1.1 of the

25   guidelines.  Specifically, I find that Ms. Diaz has

 1   provided truthful and credible information as to her

 2   involvement with this offense and the involvement of

 3   others, the defendant's information was significant and

 4   helpful to the Government's ongoing investigations and

 5   prosecutions of criminal activities within the District of

 6   Colorado and elsewhere.  More specifically, it was Ms.

 7   Diaz's cooperation with the prosecution and law enforcement

 8   which provided the Government with the grounds and evidence

 9   it needed in order to charge codefendant Marcelle Green in

10   this case.

11          As a result of granting the Government's motion,

12   subject to my ruling on the defendant's motion for

13   departure and the defendant's motion for a variant

14   sentence, I will sentence the defendant to a range centered

15   on the Government's requested departure of 35 percent off

16   the bottom of the guideline sentencing range, which is

17   approximately 16 months.

18          All right.  At this time, I'll take up that

19   portion of the defendant's motion at ECF 255 which seeks a

20   departure based on the grounds that her criminal history

21   category of VI substantially overrepresents the seriousness

22   of her criminal history pursuant to guideline Section

23   4A1.3(b).  Mr. Rathod.

24          MR. RATHOD:  Thank you, Your Honor.  I'm familiar

25   with the Court's practices and so I'm not going to rehash

```
 1    the PSI or sentencing motion 255 or the numerous letters in
 2    255.  What I do intend to present to the Court is some
 3    additional summary of information as well as Keith Inglish
 4    and Alexia Diaz briefly making -- Alexandria Diaz briefly
 5    making a statement as they did not provide written letters
 6    because I think what they have to say is short and more
 7    compelling in person.
 8              THE COURT:  Well, I will allow that, but you
 9    should know it's my practice to limit those statements to
10    three minutes.
11              MR. RATHOD:  They will be under that, Your
12    Honor.
13              THE COURT:  All right.
14              MR. RATHOD:  Your Honor, I'd like to start by
15    talking about where Ms. Diaz is today.  She is sober; she
16    is drug-free.  That is not a small accomplishment.  She's
17    in a committed relationship.  She's a mother of a
18    five-month-old child, the stepmother to three children, and
19    she's the primary caretaker of her family.
20              THE COURT:  Let me just interject here.  At least
21    the way I'm approaching your motion, because you wrote it
22    and already presented it as a motion for departure and a
23    motion for variance, that's how I'm addressing it.  So for
24    now I want to limit ourselves strictly to that portion of
25    your motion that addresses a request for a departure under
```

1    4A1.3(b) for -- or on the grounds of the Criminal History

2    Category substantially overrepresenting the seriousness of

3    your client's criminal history and then we will get to,

4    later, a motion for your -- the other portion of your

5    motion, which is that which seeks a variant motion -- a

6    variant sentence under the 3553(a) factors.

7              So for now if we can just stay with the

8    overrepresentation of the criminal history --

9              MR. RATHOD:  Yes, Your Honor.  Focusing on the

10   overrepresentation, eight of Ms. Diaz's points are for

11   petty substance abuse offenses.  Several of her Criminal

12   History Category points took place after this offense and

13   prior to her being charged in this offense.  And then

14   several of her Criminal History Category points were when

15   she was a juvenile.

16             I think one thing that's telling about Ms. Diaz's

17   criminal history -- and we'll go into it later when we kind

18   of discuss her background and where it all came from -- is

19   that if you look at doc 81, which is the original plea

20   agreement, the Government and defense counsel were, at

21   points, contemplating a Criminal History Category of III --

22   an offense level of 17, and a Criminal History Category of

23   III, which was an offense range of 30 to 37 months, because

24   when we reviewed it, we were mistaken -- I was mistaken in

25   calculating what points would go towards this offense.

1          At -- Ms. Diaz's criminal history doesn't

2     demonstrate an individual with a criminal mindset.  It --

3     if you look at her criminal history, it is a person who --

4     clearly demonstrates a person who's afflicted by mental

5     health demons that began both biologically but also from

6     the sexual trauma she suffered at the ages of six and 11,

7     and 11 being that trigger point in her introduction to Ms.

8     Carr.  Combined with someone who's suffered from addiction

9     to quell those demons.

10          And of any criminal history I've ever seen -- and

11     I think the Government even addresses this in their

12     motion -- you could just see it, and the types of offenses

13     Ms. Diaz has, the dates of those offenses, numerous of them

14     being as a juvenile.  And for those reasons, Your Honor, a

15     Criminal History Category of VI does not reflect who Ms.

16     Diaz is.  It does not reflect who she is in comparison to

17     other individuals in this case, and for those reasons, we

18     believe the Court should reduce that Criminal History

19     Category in considering her sentence.

20          THE COURT:  Now, there's -- there's a distinction

21     here that I'd like you to address because I was somewhat

22     surprised by -- you used the term, and I think the

23     Government also took exception to it, when you

24     characterized your client's criminal history as relatively

25     minor.

1           And the distinction I want you to address is the

2       distinction that I think -- that I see very -- pretty

3       clearly, which is:  What you've just described are the

4       explanations and rationales, mitigating factors that obtain

5       when one looks at the offenses that she has.  But when you

6       just look straight on as to the offenses, she does -- those

7       offenses, I don't believe it's accurate to say, are

8       relatively minor.

9           She has three juvenile felony convictions, she has

10      four prior adult felony convictions.  This is her fifth

11      felony conviction.  And one of them involving driving under

12      the influence, which is an offense that I take very

13      seriously because of the danger it puts other members of

14      our community.

15          So while there's reasons and explanations and

16      context for those convictions, I don't believe it's

17      accurate to say that this criminal history, looking at it

18      in terms of the actual convictions, one can fairly

19      characterize it as relatively minor.

20          MR. RATHOD:  And, Your Honor, I think the Court's

21      interpretation of Ms. Diaz's criminal history is accurate.

22      What we were trying to get at is Ms. Diaz's criminal

23      history doesn't contain acts of violence.  It doesn't

24      contain some of the types of crimes that this Court

25      routinely sees.

1              It contains crimes of substance abuse and it

2    contains juvenile -- three felony juvenile offenses.  It

3    contains crimes that are directly related to substance

4    abuse, but without -- what I think when -- and I will take

5    heed to the Court's use of the word "minor," but with --

6    but they are offenses that demonstrate that with Ms. Diaz

7    having her substance abuse for the first time truly under

8    control, that suggests that these offenses aren't offenses

9    that will be repeated.  And I know that's going into the

10   other section of the argument, but it -- these are the

11   offenses that are all primarily substance abuse, or

12   majority are substance abuse related offenses.

13              And I agree, Your Honor, they are numerous, but,

14   again, we would categorize them under the same guidelines

15   as what I just stated, Your Honor, eight of them for

16   substance abuse, numerous of them when she was a juvenile,

17   and then several of them between the dates of -- after this

18   offense and prior to the indictment.  And I think that

19   should all be taken into account in this case.

20              THE COURT:  All right.  Thank you.  Ms. Paluch, do

21   you wish to be heard on this motion beyond your written

22   submission?

23              MS. PALUCH:  No, Your Honor.

24              THE COURT:  All right.  All right.  As I just

25   stated, I disagree with the defendant's characterization of

1    her criminal history being, in fact, relatively minor.  Her

2    criminal history began at age of 13.  As a juvenile, she

3    had three felony juvenile adjudications and one juvenile

4    misdemeanor adjudication.  As an adult, the defendant has

5    been convicted in four prior felonies involving driving

6    under the influence and possession of drug paraphernalia.

7    She also sustained three adult misdemeanor adjudications --

8    or convictions, rather.

9         On the other hand, it's also true that the

10   defendant received one of these points for stealing a

11   bottle of alcohol nine years ago when she was 19.  And the

12   last two criminal history points assessed against her for

13   drug possession stem from her substance abuse addiction.  I

14   do agree with counsel on that.

15        And I also agree with the defendant that it's

16   reasonable to assume that those convictions and those

17   crimes were connected in some way, probably fairly

18   significantly connected, to her traumatic childhood and

19   youth.  So balancing these factors, I will grant the

20   defendant's motion in part.  And subject to my ruling on

21   her motion for variant sentence, I will further depart

22   downward pursuant to Section 4A1.3(b) of the guidelines on

23   the grounds that the defendant's Criminal History Category

24   VI to some extent overrepresents the seriousness of her

25   criminal history and sentence her subject, again, to my

1    ruling on the motion for a variant sentence, to a custodial

2    term in the range of 44 to 48 months.

3           All right.  Now we will take up, Mr. Rathod, the

4    portion of your motion at ECF 55, which seeks downward

5    variance based on the factors enumerated in 3553(a).

6           MR. RATHOD:  Your Honor, so we were talking about

7    where Ms. Diaz is today:  sober, drug-free, the mother of a

8    five-month-old child, and the stepmother to a -- to three

9    children and the primary caretaker of her family.

10          And, Your Honor, I typically do not come into this

11   courtroom or any of the federal courtrooms and argue to the

12   Court that an individual's family, her children, should be

13   a mitigating factor because that individual had those

14   children, that individual should have thought about those

15   children when committing those crimes.

16          That is not the case here.  Ms. Diaz was an addict

17   and Ms. Diaz had no children.  During the lengthy portion

18   of this case, Ms. Diaz became pregnant.  She found love,

19   she found a partner.  And I'm not going to go into the

20   details about that relationship because, in much shorter

21   than three minutes, that's where I would like Mr. Inglish

22   to discuss.

23          THE COURT:  All right.

24          MR. RATHOD:  But for the first time in her life,

25   she has stability, she has a solid foundation from where

1    she could grow.  And that -- it's this foundation, it's

2    this opportunity that she has right now and why we're

3    asking for what I will say we understand is a significant

4    departure down to probation.  It's because it gives her the

5    tools right now, the continued supervision, the continued

6    monitoring -- and I think the Court is well aware that

7    probation is not a free pass, it is a significant

8    punishment, but it gives Ms. Diaz the opportunity to

9    continue to succeed, to continue to be that caretaker and

10   to help her children and her stepchildren not make the

11   mistakes she made.

12        And this was no easy accomplishment for Ms. Diaz.

13   To emphasize this, let's talk about where Ms. Diaz was when

14   this case started.  She was an addict.  There is no

15   question, at the beginning of this case we had reaffirmed

16   Ms. Diaz's plea because she was a drug addict.  And she was

17   a dual diagnosis individual suffering from both mental

18   health issues, which she then treated and self-treated with

19   alcohol and drugs.  She was in and out of treatment

20   facilities, in and out of prisons, in and out of jails and,

21   as the Court has just reviewed, primarily for substance

22   abuse issues.

23        So why was she involved in this case?  So she was

24   participating in this scheme for two reasons:  to feed her

25   addiction and to integrate -- sorry, ingratiate herself to

1    Ms. Carr, the mother figure of Ms. Diaz.  So taking one

2    more step back, looking at Ms. Diaz's history -- and the

3    Court's well aware, so I'm not going to rehash it all

4    out -- her sexual trauma at age six which I think she

5    repressed, but the real trauma of being at age 11 when her

6    mother's boyfriend sexually -- repeatedly sexually

7    assaulted her.

8            She was then -- her mother chose not to believe

9    her.  She was removed from the home; she was placed in a

10   mental health facility.  That -- that tells you the level

11   of the trauma that she suffered.  It also tells you the

12   level of the mental health issues here that are significant

13   and mitigating factors.

14           So she's placed in a mental health facility from

15   that -- ages of 11 to, when you see around 13, when Ms.

16   Diaz begins to have interactions with the law.  So she's

17   then rescued and this is how Ms. Diaz looked at it.  She

18   was rescued by Ms. Carr.  A woman who took her in and

19   became her mother figure to her.

20           At the time Ms. Diaz looked at Ms. Carr as a

21   savior.  And I can't say that she wasn't at that time.

22   Yes, it did result in possibly untreatment of these mental

23   health issues and this trauma of sexual assault and linking

24   to the criminal history, but it got her out of the mental

25   health hospital as an 11-year-old girl.

1          So if you line up Ms. Diaz's criminal history with

2     these facts, the rest is predictable.  The sexual trauma

3     and abandonment led her to conflict with the law.  And,

4     yes, Your Honor, there are people who can suffer these type

5     of injuries, suffer these type of traumas, and live

6     completely normal and productive lives.  But I will say

7     those individuals will almost, to a T, have the support of

8     family, the support of loved ones who are nurturing them,

9     and generally psychological and counseling support.  Ms.

10    Diaz didn't have that.  And so the result is predictable of

11    where Ms. Diaz is today.

12          When we look at this case, Ms. Diaz was invited to

13    participate in this scheme by Ms. Carr, to feed her

14    addiction.  She was a complete addict and that is what she

15    used the funds she received, that she was paid for.  She

16    wasn't doing this to get rich, she was doing this to serve

17    her addiction.

18          I'm going to then glance straight over the

19    criminal history points because I think we've discussed

20    them, but I think doc 81 and what we were originally

21    looking at for Ms. Diaz in light of her cooperation, the

22    additional points that the Court raised about Ms. Green's

23    criminal charges, about Ms. Diaz being first in line to

24    come into this and being willing to come into the beginning

25    and say, This is what I did, I'm taking responsibility.

1            And no, Your Honor, at that point she wasn't

2      clean; she was still suffering.  And I would tell you, if

3      we were at that point and we were sentencing Ms. Diaz at

4      that date, she would not have a foundation.  She would not

5      have had a place where she could grow from.  She would be

6      an addict and you would have put her in prison and she

7      would have come out and she would have reoffended.

8            That is not the woman who is sitting in front of

9      you.  We have been extremely blessed in this case that Ms.

10     Diaz had the opportunity to get out of custody and the

11     opportunity to see the light, to become a mother.  So when

12     Ms. Diaz was out of custody, she met Mr. Inglish.  She fell

13     in love.  She was pregnant, and then that pregnancy -- that

14     child growing within her was not planned, it wasn't

15     something that she had anticipated -- that gave her the

16     strength to be clean, to have the ability to treat her

17     mental health issues, to start therapy.  And then that

18     spiralled into her seeing herself -- in Mr. Inglish's three

19     children, her seeing where those children were.  Mr.

20     Inglish will talk about those -- where they were, and

21     giving her the strength and the guidance to push forward

22     into an avenue where she can be successful.

23            I know the Court must consider a lot of factors

24     and the Court will -- has to balance punishment to Ms.

25     Diaz, the Court has to balance equity within sentencing

24

1     amongst all the codefendants, but Ms. Diaz is uniquely

2     situated due to her history, due to her role in this case,

3     and due to her cooperation, but also due to the changes she

4     has made.

5              So the Court should also be considering what is

6     best not only for Ms. Diaz but for society.  And what is

7     best for Ms. Diaz is giving her that opportunity to

8     succeed, giving her the opportunity to continue to succeed.

9              If the Court -- I'm hesitant to say this, but if

10    the Court is inclined to give a period of incarceration to

11    Ms. Diaz, then we would ask that that be no more than one

12    year.  That would give -- put Ms. Diaz in incarceration,

13    which we don't believe is necessary in this case -- but it

14    would also give her the opportunity to, within a shorter

15    period of time and a shorter detachment from her daughter,

16    and -- to get back to her family and get back to her

17    daughter, causing less separation from her child and her

18    family in this case, which is, again, a new family.

19             Your Honor, we did write a doc 293, a notice of

20    conferral regarding sentencing --

21             THE COURT:  Right.

22             MR. RATHOD:  -- talking about some additional

23    factors if the Court did decide Bureau of Prisons was the

24    appropriate place for Ms. Diaz and --

25             THE COURT:  I have reviewed that and we can get to

1    those issues later in the hearing.

2        MR. RATHOD:  Thank you, Your Honor.  So there's a

3    couple of things, and I'm not sure if this would be the

4    appropriate time.  I'm looking at probation here, Your

5    Honor.  So while on probation, Ms. Diaz was supervised by

6    federal probation officer Trisha Skalmusky.  She has worked

7    very closely with Ms. Diaz.  And I was actually going to

8    call her to testify today by phone.  She actually wrote a

9    brief e-mail -- she's also provided the Court with --

10        THE COURT:  Right.

11        MR. RATHOD:  -- records about Ms. Diaz.  This

12    might be a good time if the Court would allow the probation

13    officer to read that statement.

14        THE COURT:  We don't need to do that, Mr. Rathod.

15    I received on Wednesday from Officer Skalmusky a release

16    status report which confirms what you're saying that your

17    client has been in complete compliance with all pretrial

18    release requirements and that it was her recommendation

19    that -- or statement and opinion that she did not pose a

20    flight risk or a danger to the community.

21        MR. RATHOD:  And, yes, Your Honor.  And I'll just

22    summarize, then, briefly, what Probation Officer Skalmusky

23    was also going to add.  She was going to talk about very --

24    that what Ms. Diaz has overcome is not small; that it is

25    unique.  That it is not -- she does not represent your

1     typical person.  That she has overcome so much that she has

2     a path forward that this Court should consider.

3          And when I was talking to Ms. Skalmusky the other

4     day, that's what she said.  She said that she has --

5     because we were talking about her past and she said what

6     Ms. Diaz has overcome is remarkable.

7          So I'll end it with that and I'll defer to the

8     Court whether they would -- if we should now bring up Mr.

9     Inglish and Ms. Diaz to --

10         THE COURT:  Well, we'll do that a little bit later

11    after I hear a response from the Government.  But if you're

12    done with your argument, I have some questions for you.

13         MR. RATHOD:  Yes, Your Honor.

14         THE COURT:  All right.  You've done a very good

15    job covering those factors under 3553(a) that require me to

16    consider the history and characteristics and history --

17    criminal history and the context of the criminal history of

18    the defendant and I think you've covered that very well.

19    But what you've not covered is the other factors of 3553(a)

20    that I need to consider, which is the seriousness of the

21    offense and whether the recommended sentence that you seek

22    adequately reflects the seriousness of the offense.

23         I don't recall seeing you in the courtroom when we

24    sentenced Ms. Carr last week, but I discussed then the

25    victim letters that I received from the -- from some of the

1    181 incarcerated individuals that were a victim of this

2    conspiracy and I spoke to the fact that I thought that

3    those -- some of those letters were very poignant and

4    meaningful to me in this respect:  I have an understanding

5    and I sympathize with the plight of incarcerated

6    individuals who already have a very difficult time when

7    they're released from prison, reintegrating in a lawful and

8    peaceful manner in our society with all the impediments

9    that society and others intentionally or not so

10   intentionally erect for them.

11        The letters talk about how hard it is as a

12   convicted felon to come out of prison and get a job, get a

13   loan for $1,000 used car, to rent an apartment, to

14   reestablish themselves as a productive member of society.

15   And what they discussed in those letters, some of them, is

16   now how much harder it is going to be for them to ever

17   accomplish that or accomplish that within a reasonable

18   period of time, because what these four individuals did

19   with this conspiracy is they took advantage of 180 -- 181

20   individuals who had no way to be monitoring their credit

21   history while they're sitting in the prison cell and have

22   effectively destroyed their criminal histories.

23        And -- I take judicial notice of the fact just

24   discussing, you know, employment opportunities, that

25   nowadays most employers -- prospective employers look at

1    credit histories when they're looking at prospective

2    employees or applicants because there have been studies

3    that show a correlation between folks who turn out to be

4    good employees and folks who have good credit history.  I

5    think we could argue about that to some extent, but that's

6    how certain employers do it.

7            So, in other words, there really -- this wasn't

8    just a scheme that somehow electronically moved half a

9    million dollars from the Department of Education's account

10   to four individuals' checking account, sort of victimless

11   in the sense that it was just money being moved from one

12   Government agency to four individuals.  This was a

13   conspiracy which took advantage of 180 human beings, used

14   their -- appropriated their identities, fraudulently made

15   applications on their behalf to schools, and in so doing,

16   caused the incredible havoc that identity theft causes

17   nowadays, and made more extreme by the fact that these

18   folks are already going to have a very difficult time

19   becoming productive members of our society again and now

20   they have to deal with credit histories that have been --

21   one individual talked about how his credit history's now

22   totally red flagged and he doesn't know when, if ever, he's

23   going to ever be able to have any credit to do anything in

24   the future as he gets out.

25           So I'd like you to address the seriousness of the

1    offense, the effect that these crimes have on these victims

2    from your client's perspective, and whether you believe a

3    probationary sentence truly reflects the seriousness of the

4    harm that your client and her three colleagues inflicted on

5    these 180 individuals.

6            MR. RATHOD:  Yes, Your Honor.  So I think I can

7    look at that in two aspects.  The first being that

8    probation is not a free pass and the case law repeatedly

9    states that.  That it is -- that it is difficult, that it

10   is -- that it is punishment.  And I think looking at

11   probation as not punishment doesn't do it justice.

12           THE COURT:  I'm not looking at it as not

13   punishment, I'm asking whether it fairly reflects the

14   seriousness of the crime.  If this -- I not infrequently

15   sentence defendants to probation, but those are things, for

16   example, of mail carriers that steal $100 of credit -- gift

17   cards from the mail that they are delivering.  And I think

18   probation fairly reflects the seriousness of that crime.

19           We're talking about the crime that I've described

20   and summarized, and so the question being does probation

21   fairly reflect the seriousness of your client's crime as

22   opposed to just a hypothetical fairness or difficulty of

23   probation as a sentence?  I agree that being -- having the

24   mantle of a felon and being on probation and being subject

25   to being reincarcerated for being in violation of the

1    terms -- of fairly strict terms of probation is not a

2    nonpunishment, but the question is, is it a fair reflection

3    of the seriousness of the offense?

4          MR. RATHOD:  I think it is a fair reflection of

5    the seriousness of the offense when you factor in her role

6    in the offense.  And I'm not going to say Ms. Diaz just

7    didn't participate, but she didn't create the plan, she

8    didn't -- she wasn't the one who decided to target the

9    Department of -- individuals who are incarcerated.

10         And she participated in the plan to feed her

11   addiction.  So I think when you -- and you also look at why

12   she participated in the plan, not only to feed her

13   addiction, but because of the influence of a mother figure

14   in this case, Ms. Carr.  So I think when you factor in all

15   those things and you look at them within the seriousness of

16   the offense, I would agree with you, Your Honor, that if we

17   were just looking at the seriousness of this offense in a

18   vacuum, that incarceration would be the appropriate -- some

19   level of incarceration would be the appropriate punishment;

20   however, when we factor in Ms. Diaz's role, we factor in

21   the reason she participated, then I think that allows you

22   to focus more on the 3553(a) history and characteristic

23   factors of -- and allow Ms. Diaz the opportunity, and I do

24   believe it is an opportunity, of probation.

25         THE COURT:  Okay.

1          MR. RATHOD:  Hopefully that answers the Court's

2     questions.

3          THE COURT:  Yes, you have.  Thank you.  The two of

4     you can sit down.

5          And I will ask Ms. Paluch to take the lectern and

6     give me the Government's response in opposition to the -- I

7     guess specifically in opposition to the defendant's request

8     for a probationary sentence.

9          MS. PALUCH:  Thank you, Your Honor.  I'd like to

10    begin by saying I agree with Mr. Rathod that it truly is

11    remarkable the strides that this defendant has made.  I

12    believe she should be commended for the progress she has

13    made with the struggles that she has faced, and everything

14    in her life is going so well, and so for her to be standing

15    before the Court facing the possibility of a prison

16    sentence, it's got to be just so, so terrifying for her.

17          At the same time, the Court and the Government is

18    required to look at all of the factors that the Court just

19    discussed in trying to figure out what is a fair and

20    appropriate sentence, one that is sufficient but not

21    greater than necessary.  As we stated in our pleading, we

22    do agree that a variance of some sort is warranted here,

23    but we don't believe that a sentence of probation is the

24    appropriate sentence.

25          We based our recommendation for a variance in

32

large part on the -- at the young age that she got involved

in this scheme due in large part primarily with her

association with Heather Carr, in addition to the traumatic

childhood that she faced.

And the PSR details that trauma starting at age

seven, leading up to her criminal activity starting at age

13.  So at a time when her peers were navigating middle

school, this defendant was navigating the criminal justice

system as well as drug abuse.  But still, as we've

discussed, we're forced to consider the nature and

circumstances of the offense, the seriousness, the need for

deterrence in light of this criminal history that you have

before you, the amount of loss to the Government, the

amount lost in hardship to the community colleges, the harm

caused to the victims that the Court has talked about.

When we started today, Your Honor, we started at

the bottom of the guideline of a 92-month sentence.

Through the departures based on overrepresentation and

substantial assistance, that range has now been reduced

significantly.  I do believe -- I think the Court was in a

44- to 48-month range when we left off --

THE COURT:  We're at about half of the original

bottom of the range.

MS. PALUCH:  Right.  And to go from 92 all the way

to probation, I just don't see the justification for it

1    given the nature of this case and the harm caused.  And

2    that's why the Government submits that a sentence of 33

3    months incarceration would satisfy all of the factors of

4    3553(a) that we have discussed here today.  There's

5    reference to her participation because in order to feed her

6    addiction and -- and we don't doubt that that was the case.

7         But whether someone is feeding the addiction or

8    they're feeding their need for greed and for money, there

9    still has to be a consequence for engaging in that type of

10   conduct.  I'd cite to RR 6 of the PSR, which states without

11   a doubt there needs to be an element of punishment via a

12   custodial sentence in this case.

13        And I think it's difficult to -- when you have

14   four defendants all participating in this scheme, to go

15   down to probation in this case and -- and the ripple effect

16   of such a sentence to the other defendants in this case.

17   So --

18        THE COURT:  Well, let me ask -- stop you there and

19   ask you:  How does the Government view the relative

20   culpability of the four defendants in this case?

21        MS. PALUCH:  The way we look at the case, you

22   know, it's interesting, is what we argued at trial, that

23   without Ms. Carr, without those Social Security numbers,

24   they don't have -- there are no claims to submit.

25        THE COURT:  Yeah.  I think I said that at her

1    hearing.  Without her access as a Wells Fargo Bank employee

2    to the Accurint database, there would have been no crime

3    and no conspiracy.

4           MS. PALUCH:  That's correct.  And -- but at the

5    same time, without addresses for receipt of the debit

6    cards, the crime does not occur.  Even if they submit these

7    claims, if they don't have an address where they can go and

8    retrieve that and access that debit card, they don't

9    receive the money.  It may be returned to sender if they

10   had picked addresses where the people don't understand why

11   they are receiving these.  So that's another aspect of it.

12          The other part is all of the defendants from the

13   investigation, from the trial testimony, all of these

14   defendants participated in the submission of the claims,

15   the documents that had to be submitted, the completion of

16   the homework, they were all taking the class.  So when you

17   look at every single defendant, they all played a necessary

18   role --

19          THE COURT:  Well, but let me just clarify

20   something.  That's not what was stated in the plea

21   agreement.  I think the parties have addressed, or at least

22   you have addressed the fact at the change of plea, which

23   now I'm reminded we had this cloud of drug use at the time,

24   but the plea agreement in Ms. Diaz's plea agreement, she

25   stipulated to a certain level of involvement primarily

```
 1    being, you know, the mail-drop recipient addressee for
 2    these cards.  But that at this now clouded change of plea
 3    hearing, she admitted to further involvement, specifically
 4    what you just said in terms of that she, herself, admits
 5    that she participated in the filling out and submission of
 6    these applications, which you say that subsequent
 7    debriefing, interviews, of Ms. Carr and someone --
 8               MS. PALUCH:  Ms. Green.
 9               THE COURT:  -- Ms. Green, that you confirmed the
10    accuracy of these additional admissions at the change of
11    plea hearing.
12               MS. PALUCH:  Correct.  And I think it would be
13    appropriate, Your Honor, to stick with the plea agreements,
14    to stick with what she admitted at the change of plea
15    hearing.  So in the plea agreement, it states that she did
16    provide addresses, that she did provide the cards to the
17    other coconspirators, that she did open the P.O. box in the
18    initial -- the woman with the initials of J.C.
19               When she was arrested, there were documents
20    related to the scheme found in her possession.  When the
21    house was searched, her fingerprints were found on
22    documents.  Those are all facts that she admitted in her
23    plea agreement.  Then when she was at the podium, she
24    agreed that she did submit false FAFSAs as well.  So, you
25    know.
```

1          THE COURT:  All right, but you haven't answered my

2     question --

3          MS. PALUCH:  Exactly right.

4          THE COURT:  Maybe I keep interrupting and

5     preventing you from answering my own question, which is:

6     How does the Government view the relative culpability of

7     the four defendants?

8          MS. PALUCH:  Right.  And I have a difficult time

9     answering that because it's our view that with -- that they

10    all four made it happen, all four of them made it happen.

11    I think an argument could be made that Carr is the most

12    culpable because of her access to that database.

13         THE COURT:  Could be made or should be?  I mean,

14    clearly the Government doesn't view Ms. Diaz as undertaking

15    a role as significant and major and culpable as Ms. Carr.

16         MS. PALUCH:  We do not, Your Honor.  And that's --

17    as you saw in the plea agreement, we agreed with the

18    two-level reduction for minor role in the offense.  So

19    clearly if you were to rank the four, I would say Ms. Diaz

20    is No. 4.  I think Ms. Green was much more involved than

21    Ms. Diaz.  And Mr. Thomas, our view, is that he has a

22    history of manipulating women and these three women we

23    believe were manipulated and that he benefited, but that

24    the other women probably did more of the work, did have

25    evidence --

1              THE COURT:  I thought your theory was Ms. Diaz was

2        manipulated by Ms. Carr, not by Mr. Thomas.

3              MS. PALUCH:  That's correct.  That's correct, Your

4        Honor.  I stand corrected.  I don't -- we don't have

5        evidence of Mr. Thomas' direct involvement with Ms. Diaz.

6        But I do think Mr. Thomas benefited just as much as anyone

7        else in this scheme and there is information that he was at

8        the computer doing the work that he did.

9              So I don't know that I'm answering your question.

10       I guess I would put Ms. Carr at the top, I would put Ms.

11       Diaz as No. 4, Mr. Thomas and Ms. Green in the middle.  I

12       hope I've answered your question --

13             THE COURT:  Yes, you have.  Thank you.

14             MS. PALUCH:  For those reasons we are seeking a

15       sentence, as we've stated at the beginning of this

16       hearing.

17             THE COURT:  So 34 months incarceration?

18             MS. PALUCH:  33 -- 33 months, Your Honor.

19             THE COURT:  Oh, 33.  Okay.

20             MS. PALUCH:  Yes.

21             THE COURT:  Thank you.

22             MS. PALUCH:  Thank you.

23             THE COURT:  Mr. Rathod, it's your motion, I'll

24       give you an opportunity for a brief reply.

25             Ms. Diaz, you can remain seated.

1          MR. RATHOD:  Your Honor, the -- just briefly.  I

2    think the way to look at this, to answer the Court's

3    question in relation to the culpability of the defendants,

4    if we look at this like a drug conspiracy case, you have

5    the people who are making the drugs, people who are truly

6    profiting in selling these large quantities, then you have

7    people at the bottom end who are doing the hand-to-hand

8    sales to the individual.  You need everyone in that chain,

9    and that's the whole conspiracy theory, to make the sale of

10   the drugs possible.  But the person selling the eight ball

11   of drug, while it is -- it is -- has a ripple effect

12   through society, it has harm to individuals -- and we're

13   not asking that Ms. Diaz not be punished -- Ms. Diaz is on

14   that bottom end.  And I think that kind of is a different

15   way of looking at this case.

16          With that, Your Honor, we would ask the Court for

17   guidance as to how --

18          THE COURT:  Yeah, I won't forget that you want --

19   that you have two individuals who wish to make statements

20   and the allocution, so I'll give you the appropriate queue.

21          MR. RATHOD:  Thank you, Your Honor.

22          THE COURT:  Thank you, sir.  All right.  Before I

23   rule on the defendant's motion for variant sentence, I'm

24   going to consider some of the Section 3553(a) sentencing

25   factors as they apply to this defendant.

1          The record in this case indicates that Ms. Diaz is

2     28 years old, she is a citizen of the United States.  The

3     defendant was born in Colorado Springs to parents who

4     divorced when she was six years old.  After the end of her

5     parents' marriage, Ms. Diaz and her siblings lived

6     primarily with her mother but would spend summers with

7     their father in Puerto Rico.

8          The defendant claims that between the ages of 11

9     and 12, she was sexually abused by her mother's live-in

10    boyfriend.  As a result of this abuse, the defendant was

11    taken away from her home and law enforcement became

12    involved.  Ms. Diaz was taken to Cedar Springs Hospital,

13    which is a mental health facility in Colorado Springs,

14    where she was abandoned by her mother.  The defendant was

15    picked up from the hospital by her mother's friend and

16    codefendant, Heather Carr, with whom Ms. Diaz lived for

17    approximately 18 months.

18         After getting into trouble with the law, the

19    defendant was taken from the care of Ms. Carr and placed in

20    foster care.  The defendant told the probation officer that

21    Ms. Carr has been a mother figure in her life since that

22    time.

23         In 2006, the defendant graduated with a high

24    school diploma from Ridgeview Academy Charter School in

25    Watkins, Colorado.  After high school, for brief periods of

1    time the defendant attended three different community

2    colleges:  Remington College in Colorado and Phoenix, and

3    Mesa Community Colleges in Arizona.  She did not receive a

4    degree from any of those institutions.

5        The defendant has never been married.  Since

6    November of 2016, she has shared a relationship with Keith

7    Inglish.  Mr. Inglish is a construction worker and the

8    couple live together on Monterey Road in Colorado Springs.

9    With Mr. Inglish the defendant has a healthy infant

10   daughter, Edalillana Diaz-Inglish, who was born in July of

11   last year.  In addition to their newborn child, the

12   couple's also raising Mr. Inglish's three children from a

13   prior relationship.

14       Ms. Diaz began consuming alcohol at the age of 11,

15   and at the age of 12 she was diagnosed with major

16   depression, post-traumatic stress syndrome, borderline

17   personality disorder, bipolar disorder, and oppositional

18   defiant disorders.  At that time, she and her sister made a

19   suicide fact -- suicide pact following the death of their

20   half-brother and each individually overdosed on

21   medications.  The defendant also tried to commit suicide

22   while living in a group home.  Twice as a teenager the

23   defendant was admitted to Colorado Mental Health Institute

24   in Pueblo with suicidal ideations, resulting in additional

25   diagnoses of depressive disorder and conduct disorder.

41

1          At age 17, Ms. Diaz jumped from a 60-foot cliff in

2      another attempt to commit suicide.  She landed on her feet,

3      causing spinal compression fractures which still affects

4      her to this day.  In 2012, Ms. Diaz again tried to commit

5      suicide by an overdose of controlled substances.

6          Until recently, Ms. Diaz has struggled with the

7      use of alcohol, cocaine, heroin, and opiate-based pain

8      killers.

9          With regard to gainful employment, Ms. Diaz has a

10     history of holding a serial number of retail industry

11     positions for various -- for very brief periods of time.

12     She acknowledged to the probation officer that she has a

13     hard time maintaining employment and that she also has a

14     hard time, quote, dealing with people or customers, end

15     quote.

16         With regard to defendant's Criminal History

17     Category, according to the presentence report, she has four

18     juvenile adjudications, she's been assessed 17 criminal

19     history points by the probation officer, and she is before

20     me on her fifth adult felony conviction.

21         As I referenced previously, Ms. Diaz has a

22     significant criminal history that began when she was just

23     13.  As a juvenile she sustained three felony adjudications

24     and one misdemeanor adjudication and spent the majority of

25     her youth in out-of-home placements and with the Colorado

1   Department of Youth Corrections.

2            As an adult, the defendant has been convicted in

3   four prior felonies involving driving under the influence

4   and possession of a drug -- possession, rather, of drug

5   paraphernalia.  And she has also sustained three adult

6   misdemeanor convictions.

7            According to the report, the defendant has been

8   granted probation and short-term jail sentences in most

9   cases, but according to the probation officer, her

10  compliance on probation has been poor, prior to this case,

11  I guess, in terms of pretrial release, has been poor in

12  nearly every instance.  In two of her adult felony cases,

13  her probation was revoked and she was sentenced to 18

14  months in prison.

15           Turning to the nature and circumstances of the

16  offense, given the voluminous details of the defrauding of

17  the Government perpetrated by the defendants in this case,

18  I incorporate by reference the excellent summary of Ms.

19  Diaz's criminal activity in this case prepared by the

20  probation officer at paragraphs 18 through 14 -- paragraphs

21  8 through 14 of her presentence report.

22           I will therefore now, just for the record, present

23  a substantially abbreviated summary of the stipulated facts

24  of this case as they apply to this defendant.

25           Ms. Diaz's offense conduct spans over two years

1     and involved the defendant as well as her codefendants,

2     Heather Carr, Trammel Thomas, and Marcel Green, conspiring

3     to defraud the Department of Education by submitting false

4     claims for federal student aid.  Codefendants Carr and

5     Thomas obtained names, birth dates, and Social Security

6     numbers for a large number of incarcerated individuals and

7     used their personal information to apply for federal

8     student aid.

9           In these circumstances, these inmates are

10    correctly, in my view, considered to be vulnerable victims.

11    While defendants Carr and Thomas devised the scheme, this

12    defendant agreed to receive mail in the names of the

13    inmates at her residence and in mailboxes addresses she

14    rented in the names of other individuals.  At the time of

15    her change of plea hearing, Ms. Diaz admitted she also took

16    part in submitting student aid applications.  For her

17    participation this defendant was paid a fee.

18          During the course of the conspiracy, all four

19    defendants were involved in the submission of over 150

20    false aid applications involving approximately $1.3 million

21    in federal financial aid funds.  The Department of

22    Education disbursed over $550,000 as a result of the

23    defendant's false claims.  Of this amount, Ms. Diaz and her

24    three codefendants received over $420,000 in refunds.  As

25    of today, the defendant has served six days in pretrial

1    detention.

2            Ms. Hamilton, do you wish to make any statement at

3    this time on behalf of the probation office?

4            PROBATION OFFICER:  I don't, Your Honor.  But I

5    may at the end of sentencing clarify the departures and

6    variances in order as the Court finds them for the

7    judgment.

8            THE COURT:  Okay.  Sure.

9            PROBATION OFFICER:  Thank you.

10           THE COURT:  All right.  Mr. Rathod, if you and

11   your client could -- well, actually, instead of the two of

12   you returning to the lectern, this would be a good time to

13   have the individuals you were referring to come forward and

14   make a statement to the Court.

15           Okay.  Good morning, ma'am.  Can you identify

16   yourself for the record and tell me how you're related to

17   the defendant.

18           MS. ALEXANDRIA DIAZ:  I'm Alexandria Diaz,

19   Mercedes Diaz's sister.

20           THE COURT:  All right.  Go ahead, please.

21           MS. ALEXANDRIA DIAZ:  You guys talked a lot about

22   the past so I was there.  And it was really hard growing

23   up.  And we talked about her failure to comply or not

24   always do good on probation before.  I never thought my

25   sister would change, but for the first time in our life, we

1    get along.  And I seen her get out of jail in Arizona and

2    work really hard with no money and no family and no nothing

3    to get this done and be here today.  I didn't think my

4    sister would do so good and she is.  And she's making life

5    work and she's taking damn good care of her kid and being a

6    better mother than what I could have ever imagined and a

7    better sister than she's ever been before.

8            I do believe my sister's changed and I am afraid

9    of what prison will do to her because her progress has been

10   so good.  Thank you.

11           THE COURT:  Thank you, ma'am, for your -- for

12   coming here for your statement.

13           All right, sir, if you could identify yourself for

14   the record and tell me how it is you are related to the

15   defendant.

16           MR. KEITH INGLISH:  Keith Inglish.  I'm her

17   fiancé.

18           THE COURT:  Excellent.  Go ahead.

19           MR. KEITH INGLISH:  Ms. Diaz's came into my life

20   and we immediately hit it off.  By November 2016, we had

21   moved in together, and she was pregnant, and we got custody

22   of my three children from my past relationship.  She takes

23   care of the kids while I'm the provider of the home.  I

24   work 50 hours plus here in Denver; we live in Colorado

25   Springs.

1          I'm in fear of what would happen if she was

2     reincarcerated and it would create a serious hardship in

3     our home.  Our baby girl, along with my children, need her.

4     And due to a rough childhood at my -- my children have gone

5     through with an abusive and addictive mother, they were in

6     a bad place when she had met them.  Kacey, she is 16 years

7     old, she was a cutter.  She struggled with thoughts of

8     suicide and depression.  She is now doing really good.

9     She's in high school -- a sophomore in high school.  She's

10    got A's and B's.  She's doing very well.

11          Keith, the second, he's 11, he was antisocial and

12    very awkward.  He's surrounded -- he was surrounding and

13    secluding himself into a gamer's world.  He now -- he's

14    involved with a family activities, he has very good grades

15    in school.

16          THE COURT:  Can you attribute that in part to Ms.

17    Diaz's involvement?

18          MR. KEITH INGLISH:  Definitely.  Without her, none

19    of this would have been possible.  I just can't -- I just

20    can't express how amazing she is with my children.  She

21    took them in as her own.  My other son, his name is Konner,

22    he was so far behind academically, he was reading at a

23    first grade level; he's in fifth grade.  Just over this

24    past year that she has been work -- she worked with him all

25    summer, I mean, just drilled him with the spelling -- I

1   mean, it was amazing.  He's up to a third-grade --

2   third-grade level now.  Within another year, he's supposed

3   to be on queue with kids in his class.

4          Without her, that would have never happened.  I

5   just don't have the time, for one, and the -- I work hard.

6   I -- she's just been so amazing with my kids, I can't even

7   explain to you how much she has done.

8          I don't want to reiterate all the stuff that you

9   already heard, obviously you've heard a lot.  She has been

10   the angel and a blessing to my family.  She -- she's like a

11   glue to this family.  She holds everyone together.  I

12   just -- there's -- I just don't have the words to explain

13   to you just how much she means to this family.  I know how

14   sorry she is for the crime she has committed.  She tells

15   me -- she tells me all of the time how she regrets her

16   decision she had made.

17          Addiction is very powerful, it makes you do stupid

18   things, and the people that she has looked up to and

19   admired were -- played on her addictions instead of helping

20   her with them.  It is powerful but love has proven more

21   powerful.  She has been sober for over a year.  It's --

22   it's just been amazing.

23          The baby girl that we have, she's so beautiful and

24   she's just changed our -- my whole family so much.

25          The -- my kids were very -- when she first -- when

1    we first got custody of my kids, they were very wild, if

2    you will.  My boys were really not very -- they didn't --

3    they didn't behave very well.  She has changed that and, I

4    mean, I just -- it's just amazing how much she cares about

5    them.  The things that she does is -- it's just amazing the

6    way she does -- she goes to the schools and she just does

7    things that I wouldn't expect a girlfriend's -- you know, a

8    girlfriend to do, you know what I mean?

9             THE COURT:  Sir, we have limited time.  So I need

10    to ask you to sort of wrap it up pretty quickly.

11             MR. KEITH INGLISH:  That's it, Your Honor.

12             THE COURT:  All right.

13             MR. KEITH INGLISH:  Thank you.

14             THE COURT:  Thank you, Mr. Inglish.  I appreciate

15    your comments.

16             Ms. Diaz, if you will return to the lectern,

17    please.

18             All right, ma'am, do you wish to make any

19    statement to the Court on your own behalf before I announce

20    your sentence?

21             THE DEFENDANT:  Yes, sir.

22             THE COURT:  Go ahead, please.

23             THE DEFENDANT:  Okay.  Most of the stuff I wanted

24    to say, people have already said today, but first off, I

25    really want to accept responsibility for my crime.  I feel

49

1    deep remorse for what I've done and every day -- every day

2    since I have become pregnant it's been everything that I've

3    thought about because now I really understand what the

4    consequences are way different than before.

5            Any other time that I've gotten in trouble, I knew

6    that there was a consequence, but I didn't care because I

7    didn't care about myself.  I didn't care about my life.  I

8    had nothing to care about, so when I was doing things, I

9    didn't care if I got caught or not, you know.

10           But from the moment I got pregnant, this is the

11   only thing that I've thought about, having this hang over

12   my head for the nine months of pregnancy and then looking

13   into my daughter's eyes and looking at my stepchildren, and

14   knowing that I could be taken away from them because of

15   this is -- I can't even say how -- how much I feel like I'm

16   a failure now.

17           But -- and I know that a lot of the people that

18   come before your court are mothers, but like they said, I

19   wasn't a mother, I never felt the love that these children

20   have given me.  And when I met Keith and his kids, I knew

21   what needed to get done for them, the -- his daughter

22   Kacey, she's 16 years old, and I see her in myself, like --

23   and the boys, they were so bad.  I don't even know how to

24   explain, but I see them in me.  And I know what was going

25   to happen to them.  They were going to be sitting here when

1    they were 28 years old talking to you and asking you for

2    mercy.

3            I know for a fact that that's not going to happen

4    if I get to continue to raise them correctly.  They don't

5    have a mother.  Their mother is on drugs, gone.  I'm clean.

6    I know what drugs has done to them and I do not ever -- I

7    will not ever touch another drug in my life.  I know I

8    will -- I cannot risk that.

9            I don't know.  I brought a bunch of stuff on these

10   cards, but I just -- please, sir, just take everything into

11   consideration.  I know you've read my letter.  And that's

12   it.

13           THE COURT:  Let me ask you, ma'am, one of the

14   things that distinguishes a crime like this that took place

15   over 26 months and that has so many different victims in

16   this case, 181, distinguishes it from, say, someone walking

17   into a bank or store, robbing it once.  The difference --

18   one of the differences is that the person that robs the

19   store or robs the bank has one time to think about, well,

20   should I really be doing this, and then they go ahead and

21   do it.

22           This case, you had 26 months and 181 individuals,

23   you had a long period of time to be thinking about what you

24   were doing.  During that period of time, did you ever give

25   any thought to the individual -- the individuals who were

1   going to be victimized by what you were doing?

2           THE DEFENDANT:  Honestly, I don't think I was

3   thinking of them.  I didn't -- I wasn't really looking at

4   the victims at that point in time.  I was -- I was -- I

5   wasn't thinking at that time.

6           THE COURT:  Did you ever feel any remorse about

7   what you had done to these 181 victims before you were

8   caught?

9           THE DEFENDANT:  Well, I think that my depression,

10  I -- my depression really was what hindered any of that.  I

11  mean, I didn't care about tomorrow.  I didn't even care if

12  I lived or died or -- or anything, so I just don't -- I

13  don't know.

14          MR. RATHOD:  I think --

15          THE DEFENDANT:  It blocked me, I think, from

16  feeling -- from feeling sadness for other people.  I

17  mean --

18          THE COURT:  Do you have remorse for what you did

19  and how you adversely affected these individual's lives

20  now, now that you have been clean for a week -- a week -- a

21  year?

22          THE DEFENDANT:  Yes, sir.  And it has been over a

23  year, actually.

24          THE COURT:  Okay.  Tell me how you feel about what

25  you did today.

1          THE DEFENDANT:  I, myself, also am a convicted

2     felon.  I know how hard it is to get a job.  I know how

3     hard it is.  I mean, my credit is horrible, myself.  I

4     mean, I -- and I know how hard these people are going to

5     have to struggle because of what we've done and there's

6     nothing I can do besides get a job, get -- and give back to

7     my victims.

8          I mean, as -- I can hold a job, I can give back.

9     And I can't give back when I'm in prison, you know.  I want

10    to start to be able to give back to the victims that I've

11    offended against.

12         THE COURT:  Okay.  Anything else you wish to say?

13         THE DEFENDANT:  No, sir.

14         THE COURT:  All right.  All right, I'm prepared to

15    rule on the defendant's motion.  I agree with the defendant

16    that an additional downward variance in her sentence is

17    justified in her case, and I agree with her contention that

18    a sentence even at the 44- to 48-month range I've indicated

19    I'm considering as a result of earlier granting the two

20    departure motions filed by the parties, is greater than

21    necessary under the statute to properly affect the goals of

22    sentencing in the federal system.

23         I come to this conclusion given that even the two

24    departures I've already granted do not adequately account

25    for the reduced role Ms. Diaz played in the indicted

1    conspiracy and the fact that she was less culpable than the

2    other individuals who undertook roles of more considerable

3    and major importance in the conspiracy.  Nor does the

4    sentence that I'm contemplating after the two departure

5    motions have been granted properly or sufficiently take

6    into account the various traumas Ms. Diaz has experienced

7    in her young life, her struggles with severe mental

8    illness, her addictions to controlled substances, nor does

9    it appropriately reward her for the positive changes and

10   advancements she has made recently in her life and the

11   overwhelmingly positive circumstances she now lives, but I

12   cannot go as far as the defendant requests in her variance

13   motion.

14        To begin, in my view a sentence of probation would

15   create a substantial and unwarranted sentencing disparity

16   between and among Ms. Diaz and her codefendants even after

17   controlling for the significant differences in the relative

18   roles these four defendants played in the course of

19   carrying out the goals and the objectives of this

20   conspiracy.

21        In addition, I disagree with the defendant's

22   contention that she at most played an extremely -- quote,

23   extremely minor role in this conspiracy -- extremely minor

24   role, end quote, in this conspiracy.  To be sure, as I've

25   already noted, Ms. Diaz's role was not as critical to the

1    criminal scheme carried out in this case as were the roles

2    undertaken by her codefendants.  However, as the Government

3    has noted in its response to the motion, at her change of

4    plea hearing, this defendant admitted to being more

5    involved in that scheme than was detailed in her plea

6    agreement.

7         The Government also states in its response to the

8    motion that the subsequent debriefings of Ms. Carr and Ms.

9    Green confirm this characterization and there's nothing in

10   the record that would cause me to question the accuracy of

11   this assessment.

12        I also agree with the Fourth Circuit's statement

13   in its *Jalaram* decision, J-a-l-a-r-a-m, that the fact that

14   the defendant claims to have made significantly less money

15   from this criminal enterprise than did her criminal

16   colleagues only establishes that her participation in the

17   conspiracy was not particularly lucrative and by itself,

18   however, in my view does not establish her level of

19   culpability.

20        Finally, in my view a sentence of probation for

21   this defendant would not satisfy other important factors

22   under Section 3553(a) which I must consider and apply when

23   fashioning the most just sentence for Ms. Diaz.

24   Specifically, I find that the -- that the probationary

25   sentence sought by the defendant would fail to reflect the

1    seriousness of her offense, to afford adequate deterrence

2    to future criminal conduct, and will, in fact, not protect

3    the public from further crimes of this defendant.

4         Balancing these competing factors, given the

5    specific facts of this case, I find that the purposes of

6    sentencing are best served by granting in part the

7    defendant's motion for a variant sentence.

8         Given all of the above, I intend to sentence the

9    defendant to a period of imprisonment of 24 months, to be

10   followed by a term of supervised release of three years.  I

11   also intend to order Ms. Diaz pay restitution in the total

12   amount of $562,487.85 jointly and severally with her three

13   codefendants in this case, in addition to the special

14   assessment of $100.

15        Imposing a fine in this case would, in my view,

16   impair Ms. Diaz's ability to simultaneously pay

17   restitution.  For this reason, I intend to waive the

18   payment of any fine, apart from the special assessment, as

19   well as waive the payment of any interest on the

20   restitution amount.

21        Before I impose sentence, I'll give counsel a

22   final opportunity to make any record they believe

23   appropriate.  Ms. Paluch.

24             MS. PALUCH:  Nothing further, Your Honor.

25             THE COURT:  Thank you.  Ms. Rathod.

1    MR. RATHOD:  Yes, Your Honor.  I'd refer the Court

2    to doc 293, Notice of Conferral regarding sentence.  I

3    apologize for the titling, I wasn't exactly sure what to

4    call it, Your Honor.  So, Your Honor, we -- I conferred

5    with the Government and we're asking for three points to be

6    entered in as part of Ms. Diaz's sentencing.

7         One is that Ms. Diaz not be sentenced until after

8    her infant daughter reaches the age of one.  That -- we're

9    asking of a stay until August 29, 2018.

10        THE COURT:  Which is 13 months.

11        MR. RATHOD:  13 months, correct, Your Honor.  I

12   didn't want her to turn herself in on her daughter's

13   birthday.

14        THE COURT:  Right.  Okay.

15        MR. RATHOD:  So we provided the scientific

16   literature to the Court about that.  It also gives Ms. Diaz

17   the opportunity to arrange for child-care for not only her

18   child, but the three stepchildren in this relationship, and

19   also to prepare those older children for that departure

20   from their lives.

21        Second, Your Honor, we're asking that Ms. Diaz --

22   a recommendation that Ms. Diaz be placed at FCI Phoenix.

23   This is the closest women's facility to here.  It allows --

24   she has family in the Arizona area and it allows her family

25   to hopefully be able to visit her at some points during

1    this 24 months period.

2              And, finally, Your Honor, we're asking --

3              THE COURT:  Which I'm sure you'll advise your

4    client that, with good behavior, can be reduced by 15

5    percent.

6              MR. RATHOD:  Correct, Your Honor.  And then

7    hopefully also after a year and a half with just six months

8    left to go -- or less than a year and a half, when she has

9    six months remaining on the balance of her sentence,

10   hopefully at that point she'll be released to a halfway

11   house.  Again, there's no guarantees, but that's the hope.

12             THE COURT:  Right.

13             MR. RATHOD:  Your Honor, so the last point is to

14   make the FCI Phoenix possible, we would ask that this

15   Court, on the terms and conditions, not enter a separation

16   agreement between Ms. Diaz and Ms. Carr.  What we've found

17   is -- that can happen is if there is a separation agreement

18   between Ms. Diaz and Ms. Carr -- not that Ms. Diaz wants to

19   have contact with Ms. Carr -- but what it can result in is

20   Ms. Diaz not being placed in FCI Phoenix and placed in

21   another women's facility in another state, which would be

22   extra hard for Ms. Diaz and we see no reason for that to

23   occur.  And this is because Ms. Carr's already been

24   sentenced to FCI Phoenix, she'll get there first.  So we

25   have a concern about that.

```
 1              THE COURT:  Well, Ms. Carr's been sentenced to the
 2    federal facility for women appropriate to her security
 3    designation in the District of Colorado.  That's my
 4    recommendation.  It may, in fact, be FCI Phoenix, as you
 5    say, but I don't recommend to a particular institution,
 6    just to an institution within a particular district and one
 7    that's suitable to the security designation.
 8              MR. RATHOD:  And I think the Government can
 9    correct me if I'm wrong, but I think FCI Phoenix is the
10    only one in the district.
11              THE COURT:  Maybe Ms. Hamilton can tell us.
12              PROBATION OFFICER:  If my memory serves me right,
13    Your Honor, I believe there's also one in Tucson, Arizona.
14              THE COURT:  A women's facility in Tucson as well?
15              PROBATION OFFICER:  I can look like --
16              THE COURT:  Why would they have two women
17    facilities in Arizona and we have none?
18              PROBATION OFFICER:  I'm not sure.
19              THE COURT:  I don't know why I'm asking you that
20    question, but --
21              MR. RATHOD:  We would ask, just to avoid any
22    complications, I'm not sure if one of those facilities is a
23    higher-level facility, but if the separation agreement is
24    just listed as not applying to codefendants in this --
25    well --
```

1          THE COURT:  Well, I should tell you I wasn't

2     even -- I wasn't even thinking about doing that.  I mean,

3     it's good that you flagged that issue and you've asked me

4     now not to include that in the judgment, that's my

5     inclination, but first let me ask with respect to -- we'll

6     get to the voluntary surrender in just a few minutes, but

7     with respect to the recommendation of the facility

8     declaration that a separation agreement not be included in

9     the judgment, is there any objection from the Government?

10          MS. PALUCH:  No, Your Honor.

11          THE COURT:  All right.  So I will grant those two

12     requests.

13          MR. RATHOD:  Thank you, Your Honor.

14          THE COURT:  All right.  I find that a guideline

15     sentence in this case would be greater than necessary to

16     accomplish the goals of sentencing and I will instead

17     impose a sentence below the guideline sentencing range.

18          In addition, I find that the sentence I will

19     impose in this case reflect the seriousness of the offense,

20     affords adequate deterrence to future criminal conduct, and

21     will protect the public from further crimes of this

22     defendant.

23          Accordingly pursuant to the Sentencing Reform Act

24     of 1984, it is the judgment -- whose phone is making that

25     noise?  Please turn it off.

1      UNIDENTIFIED WOMAN:  Yes.

2      THE COURT:  Did you not read the sign at the --

3      UNIDENTIFIED WOMAN:  I did and --

4      THE COURT:  -- outside the doors saying that the

5  phone -- no phone should be on in the courtroom?

6      UNIDENTIFIED WOMAN:  Yes, sir.

7      THE COURT:  Let me start over.  Pursuant to the

8  Sentencing Reform Act of 1984, it is the judgment of this

9  Court that the defendant, Mercedes Diaz, be committed to

10  the custody of the Bureau of Prisons to be imprisoned for a

11  term of 24 months.  In serving this term of incarceration,

12  the Court recommends that the director of the Bureau of

13  Prisons give the defendant full credit for time served in

14  pretrial detention.  The Court also recommends that the

15  defendant be incarcerated at a facility appropriate to her

16  security designation located within the district of

17  Arizona.

18      Upon release from imprisonment, the defendant

19  shall be placed on supervised release for a term of three

20  years.  While on supervised release, the defendant shall

21  not commit another federal, state or local crime, shall not

22  possess a firearm as defined under 18 United States Code

23  Section 921 and shall comply with the standard conditions

24  that have been adopted by this court in District of

25  Colorado General Order 2016-1.

 1          The defendant shall not unlawfully possess and she

 2     shall refrain from unlawfully using a controlled substance.

 3     The defendant shall submit to one drug test within 15 days

 4     of release on supervised release and two periodic tests

 5     thereafter.  The defendant shall cooperate in the

 6     collection of DNA as directed by the probation officer.

 7          The Court finds that the following special

 8     conditions of supervision are reasonably related to the

 9     factors enumerated in Sections 3553(a) and 3583(d), and

10     they do not constitute a greater deprivation of liberty

11     than reasonably necessary to accomplish the goals of

12     sentencing.

13          Special condition No. 1:  The defendant shall not

14     incur new credit charges or open additional lines of credit

15     without the approval of the probation officer unless the

16     defendant is in compliance with the periodic payment

17     obligations imposed pursuant to the Court's judgment and

18     sentence.

19          No. 2:  As directed by the probation officer, the

20     defendant shall apply monies -- any monies received from

21     income tax refunds, lottery winnings, inheritances,

22     judgments, and any anticipated or unexpected financial

23     gains to the outstanding court-ordered financial obligation

24     in this case.

25          No. 3:  The defendant must provide the probation

1    officer access to any requested financial information and

2    authorize the release of any financial information until

3    all financial obligations imposed by the Court are paid in

4    full.  If the defendant has an outstanding financial

5    obligation, the probation office may share any financial or

6    employment documentation relevant to the defendant with the

7    Asset Recovery Division of the United States Attorney's

8    Office to assist in the collection of the obligation.

9           No. 5:  The defendant shall document all income or

10   compensation generated or received from any source and

11   provide such information to the probation officer as

12   directed.

13          No. 6:  The defendant shall participate in and

14   successfully complete a program of testing and/or treatment

15   for substance abuse as approved by the probation officer

16   until such time as the defendant is released from the

17   program by the probation office.  The defendant shall

18   abstain from the use of alcohol or other intoxicants during

19   the course of treatment and shall pay the cost of treatment

20   as directed by the probation officer.

21          No. 7:  The defendant shall participate in and

22   successfully complete a program of mental health treatment

23   as approved by the probation officer until such time as the

24   defendant is released from the program by the probation

25   officer.  The defendant shall pay the costs of treatment as

1    directed by the probation officer.

2         The Court authorizes the probation officer to

3    release to the treatment agency all psychological reports

4    and/or presentence report for continuity of treatment.

5         No. 8:  The defendant shall participate in a

6    cognitive behavioral treatment program as directed by the

7    probation officer until such time as the defendant is

8    released from the program by the probation officer.  The

9    defendant shall pay the cost of treatment as directed by

10   the probation officer.

11        Finally, No. 9:  The defendant shall remain

12   medication compliant and shall take all medications that

13   are prescribed by her treating health-care provider.  The

14   defendant shall cooperate in random blood tests as

15   requested by her treating health care provider and/or her

16   supervising probation officer to ensure that a therapeutic

17   level of her prescribed medications is maintained.

18        With respect to restitution, the defendant is

19   ordered to make restitution in the total amount of

20   $562,487.85 in the amounts and to the individual victims as

21   set forth in the table found at paragraph 129 of the final

22   presentence report, ECF 241.

23        This restitution obligation is ordered to enter

24   against the defendant jointly and severally with her three

25   codefendants in this case:  Heather Carr, Marcelle Green,

1    and Trammel Thomas.

2           The defendant will pay a special assessment of

3    $100 which shall be due and payable immediately.

4           The Court finds that the defendant does not have

5    the ability to pay a fine in light of the restitution

6    obligation imposed by the judgment.  The Court, therefore,

7    waives payment of any fine other than the special

8    assessment and for this reason, waives payment of any

9    interest on the restitution amount.

10          The special assessment and restitution obligations

11   are due immediately.  Any unpaid restitution balance upon

12   release from incarceration shall be paid in monthly

13   installment payments during the term of supervised release

14   of not less than 10 percent of the defendant's gross

15   household monthly income.

16          Within 15 days of release from custody, the

17   defendant shall meet with the probation officer to develop

18   a plan for the payment of the unpaid portion of her

19   financial obligations under the Court's judgment.  This

20   plan will be based on the defendant's income and expenses.

21   The plan will be forwarded to the Court for review and

22   approval.

23          All right.  With respect to voluntary surrender,

24   Ms. Paluch, let me get on the record:  Does the Government

25   have any objection to the requested extended voluntary

1    surrender period?

2           MS. PALUCH:  We do not, Your Honor.

3           THE COURT:  All right.  My first initial reaction

4    when I first read the request was, wow, I've never given

5    someone that long a period of time to voluntary release.

6    My general practice, as probably both counsel know, is five

7    weeks, but I became convinced after I briefly reviewed so

8    many of the medical sources that the defense counsel

9    brought to my attention that there's, in fact, probably no

10   disagreement amongst medical professionals of the

11   criticality of the initial one-year bonding period between

12   a mother and a child and I decided that justice in this

13   case compelled me not to cause any lifelong or substantial

14   developmental detriment to an infant on account of the

15   crimes of her mother.

16          I find by clear and convincing evidence that the

17   defendant is not likely to flee or pose a danger to the

18   safety of any person of the community.  It is therefore

19   ordered that the defendant, Mercedes Diaz, surrender at the

20   institution designated by the Bureau of Prisons -- I'm

21   going to give you a slightly different date -- of August

22   15th, 2018, at 2 -- at 12:00 noon.  August 15th, 2018, at

23   12:00 noon.  In the interim, the defendant's bond is

24   continued and all conditions set forth in the magistrate

25   judge's order setting conditions of release shall continue

 1   to apply.

 2          Ms. Diaz, because of the very unique circumstances

 3   in your case, I have never had a defendant that I am

 4   sentencing to a custodial sentence have an infant at home

 5   and because of those unique circumstances, I'm giving you

 6   about seven months before you have to report to the Bureau

 7   of Prisons, which is about half a year longer than I

 8   normally give defendants to voluntary surrender after their

 9   sentencing hearing, so I hope you appreciate the extra

10   special leniency I'm extending to you today.

11          THE DEFENDANT:  Yes, sir.  Thank you.

12          THE COURT:  I need to also point out to you that

13   if you fail -- for whatever reason, if you fail to report

14   to the Bureau of Prisons on the 15th of August to begin to

15   serve your sentence, that such a failure to report will be

16   itself a new and separate new federal criminal offense.

17   Are we clear on that?

18          THE DEFENDANT:  Yes, sir.

19          THE COURT:  All right.  Last thing I need to raise

20   with you, Ms. Diaz, is your appellate waiver.  Pursuant to

21   the plea agreement you entered in this case, you waive the

22   right to appeal your conviction as well as the sentence I

23   just imposed except in very limited circumstances.  Given

24   that I did not impose upon you a custodial sentence which

25   exceeds the statutory maximum or one that is greater than

1       that applicable to an offense level of 17, it would appear

2       that your right to appeal under your plea agreement is

3       nonexistent unless the Government chooses for some reason

4       to appeal.

5              In any event, to the extent you retain the right

6       to file an appeal, I'm advising you that should you wish to

7       file such an appeal, a notice of appeal must be filed with

8       the Clerk of the Court within 14 days after entry of

9       judgment or your right to appeal will be lost.

10             If you're unable to afford an attorney for an

11      appeal, the Court will appoint one to represent you.  If

12      you're unable to afford the fees for filing an appeal, you

13      may file a request with the Court that such fees be waived.

14             Okay.  Is there anything further from the

15      Government at this time?

16             MS. PALUCH:  No.  Thank you, Your Honor.

17             THE COURT:  All right.  Anything further from the

18      defendant?

19             MR. RATHOD:  No, thank you, Your Honor.

20             THE COURT:  All right.  Thank you.  Ms. Hamilton,

21      I know you have a question or two for me.

22             PROBATION OFFICER:  I do, Your Honor.  A couple of

23      things, but I think first I believe there's an issue of

24      forfeiture that may need to be reflected in the judgment.

25             THE COURT:  All right.  For some reason, you

1    dropped it with Ms. Carr or --

2         MS. PALUCH:  That's correct, Your Honor.  We can't

3    obtain forfeiture through the conspiracy count, the 286

4    charge.

5         THE COURT:  Oh, that's right.

6         MS. PALUCH:  Forfeiture is not an option there, so

7    we are not seeking an order of forfeiture.

8         THE COURT:  Okay.  So the Court -- the prosecution

9    is dropping its request for forfeiture.

10        MS. PALUCH:  That's correct, Your Honor.

11        THE COURT:  All right.  All right.

12        PROBATION OFFICER:  Second, to clarify how -- for

13   the judgment, how the Court arrived at the sentence, I have

14   recorded that the 5K departure to 60 months is a departure

15   for criminal history category to a range of 44 to 48 months

16   and a variance to 24 months; is that --

17        THE COURT:  Correct.

18        PROBATION OFFICER:  Finally, Your Honor, there

19   were some changes to my recommendation regarding special

20   conditions of supervision because of the changes to the

21   standard conditions in the beginning of the year in 2017.

22        There was one condition that I recommended that I

23   don't believe the Court ordered and I'd like to review that

24   with the Court and have the Court make a finding if that is

25   an appropriate condition.

1      THE COURT:  Was that in your sentencing

2  recommendation?  Well, first of all, tell me what it is.

3      PROBATION OFFICER:  It states:  If the judgment

4  imposes restitution, you must pay restitution in accordance

5  with the schedule of payments sheet on the judgment.  You

6  must also notify the Court of any changes in economic

7  circumstances that might affect your ability to pay the

8  restitution.

9      THE COURT:  Well, the reason I specifically did

10  not include it as an enumerated special condition because,

11  in my view, it is, itself, the restitution obligation, is a

12  separate obligation, itself, under the judgment, which

13  clearly the failure to abide by it would be a violation of

14  the judgment.  So I didn't see the need to also include it

15  as a special condition.

16      PROBATION OFFICER:  Okay.  That answers my

17  questions.  Thank you very much, Your Honor.

18      THE COURT:  Okay.  Very well.  All right.  Thank

19  you.  That will be all.

20      (Proceedings concluded at 12:12 p.m.)

21

22

23                  *      *      *      *      *

24

25

1          REPORTER'S CERTIFICATE

2      I certify that the foregoing is a correct transcript

3  from the record of proceedings in the above-entitled

4  matter.

5      Dated at Denver, Colorado, this 21st day of February,

6  2018.

7

8

9

10  _                                    _

11          MARY J. GEORGE, FCRR, CRR, RMR

12

13

14

15

16

17

18

19

20

21

22

23

24

25